## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

IN RE:     **ALAN WOLF,**     :     **Chapter 13**
                  :
             **Debtor.**     :     **Bky. No.  15-10768 ELF**
                  :

# O P I N I O N

## I.    INTRODUCTION

Alan Wolf ("the Debtor") commenced this chapter 13 bankruptcy case on February 2, 2015.  His third amended chapter 13 plan ("the Plan") was confirmed on March 8, 2016.  The Plan provided for a 100% distribution on all allowed claims.  The Plan was funded by a number of monthly payments to the Trustee, followed by the sale of the Debtor's residential real estate.

The Debtor has performed all of his obligations under the confirmed plan.  He sold his real estate and made the required payments to the chapter 13 trustee.  As a result, there are sufficient funds available to pay in full all of the proofs of claim that have been filed -- assuming that they are allowed.  This includes the $85,186.89 proof of claim filed by Edward Jordan ("Jordan").

Before me is the Debtor's objection to Jordan's proof of claim ("the Objection").  For the reasons explained below, I will sustain the Objection and disallow Jordan's claim.

1

## II.    PROCEDURAL HISTORY

On May 15, 2015, Jordan filed a proof of claim, Claim No. 4, asserting a general unsecured claim in the amount of $85,186.89.  The Debtor filed the Objection on July 9, 2015. (Doc. # 36). Jordan filed an Answer to the Objection on July 23, 2015. (Doc. # 39).[1]  On August 20, 2015, the court entered a pretrial order that, inter alia, set deadlines for completion of discovery and the filing of dispositive motions.  (Doc. # 47).

On December 21, 2015, Jordan filed a motion for summary judgment.  See Fed. R. Bankr. 9014 (Rule 7056 applies in contested matters).  The Debtor filed a response to the motion on January 27, 2016.  I denied the motion on March 7, 2016.

On April 4, 2016, the court held a hearing on the Objection.  The parties filed post-trial briefs, the last of which was filed on May 31, 2016.

## III.    LEGAL STANDARDS: OBJECTIONS TO PROOFS OF CLAIM

The legal standard governing objections to proofs of claim are well established.  Earlier this year I summarized them as follows:

> In analyzing the parties' respective burdens in connection with the adjudication of an objection to a proof of claim, bankruptcy courts must consider three (3) sources of law: the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and, of course, applicable case law.   .   .   .
>
> Section 502(a) of the Code provides that a proof of claim "is deemed allowed, unless a party in interest ... objects." 11 U.S.C. § 502(a). In the face of an objection to a proof of claim   .   .   .   if the proof of claim alleges facts sufficient to support the legal liability asserted, the claimant's initial obligation to go forward is satisfied, i.e., the proof of claim itself makes out a prima facie case. The burden

---

[1] The rules of court do not require a claimant to file a written response to an objection to a proof of claim.  See Fed. R. Bankr. P. 3007.

of production then shifts to the objector to offer evidence sufficient to negate the prima facie validity of the filed claim.

Fed. R. Bankr. P. 3001(f) also addresses the evidentiary burdens in claims objection litigation. Rule 3001(f) provides: A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim. If a claimant complies with the rules of court, the proof of claim achieves prima facie evidentiary status through Rule 3001(f). In effect, a proof of claim that complies with the rules of court serves as both a pleading and as trial evidence, even in the face of an objection to the claim. It follows that if the claimant's proof of claim satisfies Rule 3001(f), the burden of going forward with evidence contesting the validity or amount of the claim shifts to the objector. To meet this burden, the objector's evidence if believed, [must] refute at least one of the allegations that is essential to the claim's legal sufficiency.

In a claims objection contested matter in which a proof of claim is prima facie valid and the objector meets its burden of production, the ultimate burden of proof remains with the claimant. Thus, once the objector has presented evidence, the claimant may then need to offer additional evidence to carry its burden of persuasion.

In re Henry, 546 B.R. 633, 634–35 (Bankr. E.D. Pa. 2016) (quotations and citations omitted) (italics in original).

In this matter, the Debtor indisputably met his burden of production with evidence disputing the validity of Jordan's claim. Therefore, the shifting burdens culminate simply as follows: Jordan bears the burden of proof as to the validity of his claim.


## IV.   FINDINGS OF FACT

The Debtor and Jordan testified at trial. In addition, they offered into evidence a Stipulation of undisputed facts and a number of exhibits.

Set forth below are my findings of fact. To the extent the witnesses offered conflicting testimony on issues relevant to the disposition of this matter, my findings reflect a resolution of those conflicts based on my assessment of the witnesses' demeanor, motivations, credibility and related factors.

3

### The Debtor's Business Entity: Modern Classics, Inc.

1. Modern Classics, Inc. ("Modern Classics") was a licensed dealership of collector cars that was incorporated in 1975 and operated at 4920 North 20th Street, Philadelphia, PA. (N.T. 5-6).

2. The Debtor was the principal shareholder with a 90% ownership of Modern Classics. (Id. at 7).[2]

3. The Debtor controlled Modern Classics, handling most (if not all) of its transactions. (Id.).

### The Initial Transaction: The "Eldorado"

4. In early 1999, the Debtor advertised the sale of a 1953 Cadillac Eldorado Danbury mint automobile ("the Eldorado"). (Ex. A, ¶1; N.T. 7-8).

5. Jordan contacted the Debtor in response to the advertisement. (N.T. 8).

6. On Modern Classics stationery, the Debtor provided Jordan with certain additional information about the Eldorado, including the proposed payment price ($59,000.00) and instructions to make out a check "payable to Alan D. Wolf," if Jordan wished to purchase the vehicle. (Ex. C).

7. On February 7, 1999, Modern Classics entered into a contract ("the Contract") with Jordan, in the form of a bill of sale for a sales price of $59,000.00 (Ex. A, ¶4; Ex. D).[3]

---

[2] The Debtor's wife owned the remaining 10%. (N.T. 7).

[3] During the hearing for the Objection to Claim No. 4, the Debtor testified that while he may have labeled himself as the "seller," the invoice was issued by Modern Classics. (N.T. 28). At the same time, Jordan testified that he believed that the Debtor personally was the seller. (N.T. 66-67).

I find that the Contract was between Jordan and Modern Classics, not Jordan and the Debtor. This may be the most critical finding of fact in this contested matter. I will explain my reasons for this finding in Part V.C, below.

8.  The Contract has the words "Modern Classics" under the heading "Invoice" and includes the Debtor's signature over the words "Alan D. Wolf/Seller." (Ex. D; N.T. 28).

9.  The Contract stated a sales price of $59,000.00 and provided for Debtor to make certain improvements to the car. (Ex. A ¶¶3, 4; Ex. D).

10. Jordan accepted the Contract and sent the Debtor a check dated February 12, 1999, in the amount of $59,000.00, payable to the Debtor as an individual. (Ex. A, ¶ 6; N.T. 27).

11. The Debtor endorsed the check and deposited it into his personal bank account at Sovereign Bank. (Ex. A ¶¶7, 8; Ex. F; Ex. O at 24-25; N.T. 29-30).

12. The Debtor carried out and completed the promised improvements on the Eldorado. (N.T. 10, 13).

13. The Debtor never transferred title nor delivered the Eldorado to Jordan. (N.T. 13). [4]

14. Around August, 2000, the Debtor sold the Eldorado to someone else for $48,000.00 (N.T. 14, 39).


**The Replacement Car: The "Speedster"**

15. After selling the Eldorado, the Debtor initially offered to refund Jordan's payment.  (Ex. G).

16. Subsequently, however, in early 2001, the Debtor offered Jordan a replacement car in lieu of a refund. (Ex. A ¶10; N.T. 70; Ex. H).

17. The Debtor offered to sell Jordan a 1953 custom-body Cadillac ("the Speedster").  To match the Eldorado, the Speedster required some work, such as chrome removal, painting and re-upholstering with leather seats.  (Ex. A ¶10; N.T. 16-17).

18. Jordan accepted the Debtor's offer of the Speedster as a replacement car. (N.T. 78).

---

[4] The parties blamed each other for not completing the Eldorado transaction.  The Debtor testified that he could not reach Jordan and that he believed Jordan simply did not want to take possession of the car.  (N.T. 12-13).  Jordan denied this and claimed that he made "phone calls" and all he "got was excuses."  (N.T. 70).  I need not resolve this factual dispute.

19. The additional work on the Speedster took much longer than expected — at least 10 years, if it was completed at all. (N.T. 19).

### The Repayment Agreement in 2010

20. On July 29, 2010, Jordan's trust attorney, Scott Williams ("Williams"), sent the Debtor a letter demanding repayment of $60,000.00 and threatening legal action if the Debtor failed to repay within 10 days of receipt.  (Ex. D-1; N.T. 85).[5]

21. On August 5, 2010, the Debtor faxed Williams a proposal to repay the $60,000.00 through five (5) monthly installments of $12,000.00 starting September 6, 2010, and continuing through February 15, 2011 ("the Repayment Agreement").  (Ex. A ¶12; Ex. J; N.T. 22, 34).

22. The Debtor signed the Repayment Agreement as "Alan D. Wolf" above the words "Modern Classics." (Ex. J).

23. The Debtor did not pay the first scheduled payment on September 6, 2010 (Ex. J; N.T. 35).

24. On September 22, 2010, the Debtor sent Williams a $3,000.00 check (from his personal account), postdated dated September 27, 2010 and payable to Jordan. (Exs. K & L; N.T. 35-36).

25. Jordan received and cashed this check. (N.T. 72).

---

[5] It is not clear why Jordan's attorney demanded $60,000.00 instead of $59,000.00. Various explanations were offered at trial.  (See N.T. 12, 31, 32, 46, 47, 78).  As for the lengthy delay between the Debtor's promises in 2001 and Jordan's first collection efforts in 2010, Jordan testified that he did not take any legal action because he believed that the Debtor would follow through with a replacement car or a refund. (N.T. 74:5-12).  One might wonder why he believed that and waited so long, but, in the end, that issue is not material.

26. The Debtor discussed with Jordan's counsel the possibility of selling personal assets in order to make the payments under the Repayment Agreement.  (Ex. N at 17; N.T. 34).

27. After September 22, 2010, the Debtor made no further payments to Jordan.  (See Ex..A, ¶ 19; N.T. 79).

28. The Debtor never delivered any automobile to Jordan.  (Ex. A, ¶17).

## Jordan's Lawsuit in 2012 Against Modern Classics

29. On April 25, 2012, Jordan filed a complaint ("the 1st CP Complaint") against Modern Classics in the Court of Common Pleas of Philadelphia County ("the CP Court"), docketed at No. 12-0402956.[6]

30. On February 19, 2013, Jordan obtained a judgment by default against Modern Classics in the amount of $69,280.00.

31. The CP Court granted Modern Classics' petition to open judgment on April 19, 2013.

## Modern Classics' Chapter 7 Bankruptcy in 2013

32. Modern Classics ceased its business operations in February 2013.  (Ex. O, at 7).

33. On September 9, 2013, Modern Classics filed a chapter 7 bankruptcy case in this court at Bky. No. 13-18021, which stayed Jordan's state court action against Modern Classics.

---

[6] Neither party introduced the 1st CP Complaint into evidence at trial.  However, the Debtor testified that Jordan sued Modern Classics some time before 2013.  (N.T. 21).  That fact is not in dispute, so I have taken judicial notice of the court docket of the Court of Common Pleas. See, e.g., In re Soto, 221 B.R. 343, 347 (Bankr. E.D. Pa. 1998) (a bankruptcy court may take judicial notice of the matters of record in the state courts within its jurisdiction).

34. The bankruptcy case was administered as a no-asset case and closed on May 6, 2014. [7]


### Jordan's Lawsuit in 2014 Against the Debtor

35. On July 22, 2014, Jordan filed another complaint ("the 2nd CP Complaint") in the Philadelphia CP Court, this time against the Debtor. [8]

36. In the 2nd CP Complaint, Jordan asserted claims for breach of contract, fraud and unjust enrichment and demanding judgment in the amount of $70,800.00.

37. On September 26, 2014, the Debtor filed preliminary objections to the CP Court Complaint. (Debtor's Objection to Proof of Claim, Ex. A).

38. On November 10, 2014, the CP Court sustained the Debtor's preliminary objections in part by striking the breach of contract claim from the Complaint, but overruling all of the other preliminary objections. (Id.).

39. The Debtor filed an Answer to the 2nd CP Complaint on December 16, 2014. See n.6, supra.

40. On February 5, 2015, after the Debtor's bankruptcy filing, the CP Court placed the state court action against the Debtor in deferred status. (Id.).

---

[7] Again, the facts regarding the Modern Classics chapter 7 bankruptcy case are not in dispute. I have taken judicial notice of this court's docket. See In re Mullock, 404 B.R. 800, 801 (Bankr. E.D. Pa. 2009); In re Scholl, 1998 WL 546607, at *1 n. 1 (Bankr. E.D. Pa. Aug.26, 1998).


[8] Neither party introduced the 2nd CP Complaint into evidence. However, it is available for review because it was attached to Jordan's proof of claim. Both parties appear to have assumed that documents attached to the proof of claim and the objection thereto (the contested matter equivalents to pleadings in civil litigation or an adversary proceeding) are automatically part of the trial record. Not true. However, because both parties made that assumption, I will treat the attached documents as part of the trial record.

# V.    DISCUSSION

## A.  Introduction

Jordan presents two (2) theories for allowance of his claim.

First, he asserts that his dealings, i.e., his contract or contracts, were with the Debtor individually, not the Debtor's corporate entity, Modern Classics. Thus, he asserts that the Debtor is liable for a simple breach of contract: his failure to deliver an automobile after accepting Jordan's payment.  Alternatively, Jordan argues that if his contract was with Modern Classics, the claim should be allowed based on the doctrine of unjust enrichment.[9]

The Debtor's primary defense is that he had no contractual relationship with Jordan.  He also argues that Jordan failed to meet his burden of proof on all of the elements of the unjust enrichment claim.

Jordan invokes Fed. R. Civ. P. 36 and seeks to preclude the Debtor's primary defense that there was no contract.  Jordan asserts that the Debtor is bound by admissions he failed to answer during discovery -- i.e., the Debtor conceded (by failing to answer the requests) that he personally entered into a contract with Jordan.  See Fed. R. Bankr. P. 9014(c) (Rule 7036 applicable in contested matters); Fed. R. Bankr. P. 7036 (incorporating Fed. R. Civ. P. 36).

---

[9] At the conclusion of the trial, Jordan reserved the right to seek allowance of his claim based on fraud.  (N.T. 112-13).  Jordan did not discuss fraud in his post-trial brief.  Therefore, I consider Jordan to have abandoned that legal theory.

Since there is no dispute that a breach of a contract occurred,[10] Jordan contends that he is entitled

to damages and that his claim should be allowed.

I find Jordan's Rule 36 contention to be without merit.  I explain why below, after

which I will address the merits of the contract claim and the unjust enrichment claim.


**B.  The Debtor's Failure to Respond Timely to Jordan's Requests for Admission**

On October 19, 2015, Jordan served the Debtor with his requests for admission ("RFA").

The RFA defined the term "You" as meaning, in pertinent part, "the party to whom these

requests   .   .   .   are addressed," i.e., the Debtor.  Among the requests were:

> 3.  Admit that You made the offer to sell the Eldorado to [Jordan] to induce
> [Jordan] to sell the Eldorado to Jordan.
>
> 12.  Admit that, after selling the Eldorado to someone other than [Jordan],
> You offered to deliver to [Jordan] the Roadster.
>
> 16.   Admit that you signed the [August 5, 2010] Agreement and sent the
> Agreement to [Jordan] by facsimile on August 5, 2010.

(Ex. B).


The Debtor did not respond to the RFA within thirty (30) days.

On December 21, 2015, Jordan filed his motion for summary judgment.  In response to

the motion, the Debtor asserted that all of the transactions were "between Jordan and the

corporate entity Modern Classics, LLC [sic]." (Doc. # 89, Debtor Mem. at 1).  As part of the

response, the Debtor also belatedly attempted to respond to the RFA.  However, instead of

responding to the RFA served on October 19, 2015 in this bankruptcy case, the Debtor

---

[10] There are possibly as many as three (3) contracts that may be involved here: the
original February 1999 contract for the purchase of the Eldorado, the 2001 replacement contract
for the Speedster and the 2010 Repayment Agreement.  None of them were fully performed.

(carelessly) answered the set of Requests for Admission Jordan served him in the state court

action.  None of the requests in state court action against the Debtor requested the admission of

the particular facts stated in RFA Nos. 3, 12 and 16.  So, putting aside the general tardiness of

the Debtor's response, the Debtor simply never responded to RFA Nos. 3, 12 and 16.

As explained below, for two (2) independent reasons, I reject Jordan's contention that the

unanswered RFA's compel the finding that Jordan contracted with the Debtor rather than

Modern Classics.

## 1.

First, quite simply, the RFA's did not solicit the admission that the Debtor personally

contracted with Jordan.

None of the RFA's unequivocally requested that the Debtor admit that he was the party

who contracted with Jordan.  Rather, the RFA's focused on the Debtor's conduct, i.e., concrete

actions taken by the Debtor: communicating an offer to sell an automobile, proposing to

substitute the replacement automobile for the initial one and signing a document.  It is not

obvious from the language in the RFA's that the Debtor took those actions on his own, personal

behalf.  Rather, the actions are equally consistent with steps the Debtor would have taken on

behalf of his closely held corporation.  See generally Daniel Adams Associates, Inc. v. Rimbach

Pub., Inc., 519 A.2d 997, 1000–01 (Pa. Super. Ct. 1987) (corporation is a creature of legal fiction

which can "act" only through its officers, directors and other agents and when a party contracts

with a corporation through its agent, the corporation alone is liable breach of the contract).

At best, the unanswered RFA's are ambiguous on the ultimate fact Jordan sought to

prove.  Indeed, at trial, the Debtor readily conceded that he was the individual who took the

11

actions described in the RFA's.  He simply added that he took these actions on behalf of his

corporation.  It is hardly clear from the text of the RFA's that they were designed to establish

that the contracts were between Jordan and the Debtor, as an individual, and it would be

inequitable to read them that broadly.


**2.**

Second, even if I accord a more expansive reading of the RFA's, I find that the Debtor is

not bound by the unanswered RFA's.

Fed. R. Civ. P. 36(a)(3) provides:

> (3) *Time to Respond; Effect of Not Responding*.  A matter is admitted unless,
> within 30 days after being served, the party to whom the request is directed serves
> on the requesting party a written answer or objection addressed to the matter and
> signed by the party or its attorney. A shorter or longer time for responding may be
> stipulated to under Rule 29 or be ordered by the court.

Fed. R. Civ. P. 36(b) provides:

> *Effect of an Admission; Withdrawing or Amending It*.  A matter admitted under
> this rule is conclusively established unless the court, on motion, permits the
> admission to be withdrawn or amended. Subject to Rule 16(e), the court may
> permit withdrawal or amendment if it would promote the presentation of the
> merits of the action and if the court is not persuaded that it would prejudice the
> requesting party in maintaining or defending the action on the merits. An
> admission under this rule is not an admission for any other purpose and cannot be
> used against the party in any other proceeding.

Rule 36 admissions are conclusive as to the facts admitted when the requesting party fails

to withdraw or amend them before trial.  E.g., Airco Indus. Gases, Inc. Div. of the BOC Group,

Inc., v. Teamsters Health and Welfare Pension Fund of Phila. and Vicinity, 850 F.2d 1028, 1036-

1037 (3d Cir. 1988).  However, in this case, Rule 36(b) provides a basis for my ruling that the

Debtor is not bound by his deemed admission.

Under Rule 36(b), a court may, on motion, exercise discretion to permit withdrawal or amendment. Gwynn v. City of Phila., 719 F.3d 295, 298-99 (3d Cir. 2013). A formal motion is not always necessary to grant leave for withdrawal of admissions. U.S. v. Petroff-Kline, 557 F.3d 285, 293 (6th Cir. 2009). Instead, "a withdrawal or request to withdraw …may be **imputed** from a party's actions." Chancellor v. City of Detroit, 454 F. Supp. 2d 645, 666 (E.D. Mich. 2006) (emphasis in original) (citation omitted); see Kerry Steel, Inc. v. Paragon Indus., Inc., 106 F.3d 147, 153-154 (6th Cir. 1997) (counsel's oral arguments, without using the words, "I move," constitute sufficient request for withdrawal of admission).

In both his response to Jordan's motion for summary judgment and in his trial testimony, the Debtor unequivocally manifested his untimely denial of any admission that he was the party to the contract with Jordan. I will treat these actions as an implicit request that the Debtor be permitted to withdraw his admission.[11] I also will grant the request.

Under Rule 36(b), a court may permit a motion to withdraw or amend admissions if: (1) doing so "would promote the presentation of the merits of the action"; and (2) "the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits." Gwynn, 719 F.3d at 298 (alteration in original). I find both of these elements satisfied here.

As stated earlier, the RFA's were ambiguous in scope. In this respect, granting the Debtor relief from the RFA's will promote resolution of this dispute on its merits.

---

[11] Similar to the defense counsel arguments in Kerry Steel, the Debtor made oral statements that disputed the unanswered RFA's. Also, like the oral arguments in Kerry Steel, the Debtor did not say "I move" or even, "I request to amend my admissions today." While the Debtor did not challenge the unanswered RFA's with an explicit withdrawal request, his intentions, like those of the defendant in Kerry Steel were manifested clearly through his oral testimony.

Moreover, and most importantly I perceive no prejudice to Jordan.  At no point prior to trial did Jordan seek a declaration that the unanswered bankruptcy court RFA's determined conclusively that the relevant contract(s), see n.10, supra, were between Jordan and the Debtor.  Jordan also never objected to the Debtor's testimony that the contract(s) were between Jordan and Modern Classics.  In fact, Jordan's counsel solicited testimony from Jordan to support his contention that he contracted with the Debtor personally.  (N.T. 66-67, 72).

I find support for my ruling in a district court decision that involved extremely similar circumstances, Dependahl v. Falstaff Brewing Corp., 491 F. Supp. 1188 (E.D. Mo. 1980) rev'd in part on other grounds, 653 F.2d 1208 (8th Cir. 1981).

In Dependahl, before trial, the defendants failed to timely respond to the plaintiffs' requests for admissions. The plaintiffs contended that the unanswered admissions were conclusive. The district court observed that the defendants had denied the requested factual admissions in the pleadings and that the disputed facts constituted "the very heart of the plaintiffs' claims." 491 F. Supp. at 1194.  Further, at no point did the plaintiffs give any "indication that they considered the matters admitted." Id.  At trial, the plaintiffs put on their own affirmative evidence on the disputed factual issues.  In these circumstances, the court held that the defendants were not bound by the unanswered requests for admission.

Similarly, here, the Debtor has consistently contested Jordan's assertions regarding their relationship through Preliminary Objections in the CP Court, the Objection filed in this court, the response to the motion for summary judgment and at trial.  Given this history, any suggestion that Jordan believed that the Debtor suddenly was conceding the issue is implausible. In fact, Jordan's trial conduct suggests the opposite.

14

At bottom, like the <u>Dependahl</u> court, I conclude that "it would be extremely unfair to allow [Jordan] to prove the bulk of [his] case through these contested admissions." 491 F. Supp. at 1194.[12]


### C. The Contract Claim: Jordan Contracted With Modern Classics, Not the Debtor

### 1.

It is black letter law in Pennsylvania that a corporation is a separate and distinct entity from its officers or shareholders and that an individual officer or shareholder generally is not liable for the debts of the corporation, based on the individual's officer or shareholder status (even if all of the corporate stock is owned by the individual). <u>See</u> <u>In re</u> Cornmesser's, Inc., 264 B.R. 159, 163 (Bankr. W.D. Pa. 2001); <u>accord</u> <u>Weimer v. Bockel</u>, 194 A. 318, 321 (Pa. Super. Ct. 1937). Thus, "[i]n a breach of contract action, the general rule is that a corporate officer who negotiates a contract on behalf of a corporation may not ordinarily be held personally liable for contract damages." <u>Harris v. Madison</u>, 1998 WL 518181, at *2 (E.D. Pa. July 24, 1998). A corporate officer may be personally liable on a contractual obligation, however, "where it appears that it was clearly the intention of the officer to assume the obligation as a personal

---

[12] In reaching this result, I am cognizant of reported decisions in which courts have bound parties to deemed admissions even after permitting contrary trial testimony. Different outcomes may be explained by the broad discretion courts are given in applying Rule 36(b). <u>See</u> <u>Pritchard v. Dow Agro Scis.</u>, 255 F.R.D. 164, 172 (W.D. Pa. 2009) (citing cases). In the end, the application of Rule 36(b) is fact intensive. For example, in <u>In re D'Ambrosio</u>, 452 B.R. 562, 570 & n.9 (Bankr. E.D. Pa. 2011), the court found that the party who had not responded to the request for admission was aware that his opposing party intended to rely on those admissions at trial; therefore, permitting the withdrawal of the admissions would have been prejudicial – virtually the opposite of the facts presented here.

liability." Weimer, 194 A. at 321; accord In re Fairfield, 455 B.R. 849, 854 (Bankr. E.D. Pa.

2011).

In seeking to impose liability on the Debtor, Jordan does not claim that that the Debtor

also is liable on a contract made with Modern Classics.[13]  Rather, he asserts that **the Debtor was**

**the other party to the contract**, not Modern Classics.

The determination of the identity of the other party to Jordan's contract is a pure issue of

fact; if this matter had been tried to a jury, the issue would be decided by the jury.  See Weimer,

194 A. at 321; see also Darlington Brick & Clay Prod. Co. v. Aino, 310 A.2d 401, 402 (Pa.

Super. Ct. 1973).  The factfinder should make the inferential finding of fact "from all the

circumstances." Weimer, 194 A. at 321.

While Weimer and Darlington Brick frame the issue and instruct that the factfinder should

consider "all the circumstances," those decisions do not describe the standards the factfinder

should employ in determining whether the corporate officer entered into a contract personally or

merely as an agent for the corporation.  Is the subjective experience of the parties relevant?  If so,

which party's experience is determinative -- the corporate officer of the other party?  Or, should

the factfinder use some type of objective test?

My conclusion is that the appropriate focus should be on the reasonable expectations of

the party who claims to have contracted with the corporate agent personally, while employing an

objective test.  Thus, the question is: based on the actions of the corporate actor and the

---

[13] Under the "participation theory of liability," in some circumstances, a corporate officer may be
personally liable for a corporation's tortious conduct.  See, e.g., In re E. Continuous Forms, Inc., 302 B.R.
320, 343 (Bankr. E.D. Pa. 2003).  In this adversary proceeding, Jordan does not assert that Modern
Classics (acting through the Debtor) committed a tortious act (such as fraud).  See n.9, supra.

information available to the other party, was it reasonable for the other party to believe that he or

she was contacting with the officer personally, rather than the corporation?

With these principles in mind, I consider the evidence.

## 2.

Each party has marshalled evidence in support of his position.

Jordan focuses on the following facts:

- all of his dealings were with the Debtor personally;

- his checks were payable to the Debtor, not Modern Classics and were
  deposited in the Debtor's personal bank account;

- on the invoice for the Eldorado, the Debtor signed his name as "Alan D.
  Wolf/Seller;"

- in connection with the unperformed 2010 payment plan, the Debtor made the
  initial payment with a personal check and represented to Jordan's attorney that
  he might liquidate personal assets to make the remaining payments. [14]

Jordan's evidence is probative, but I find the contrary evidence more persuasive.

At the outset of the initial transaction, the Debtor made the initial offer to Jordan in

writing on letterhead that clearly and conspicuously indicated that Jordan was dealing with

"Modern Classics, Inc." (Finding of Fact No. 6).   While the invoice later issued was signed by

the Debtor as "seller" without a reference to his role as corporate officer or agent, the title of the

---

[14] In his brief, Jordan cites the unanswered RFA's and asserts that the Debtor personally
was the owner of the Eldorado that was the subject of the initial transaction in 1999. (Jordan's
Br. at 14).  Naturally, he contends that this fact supports his argument that the Debtor, not
Modern Classics, was the other party to the contract.  However, at trial, the Debtor testified
unequivocally that Modern Classics was the record title owner of the Eldorado. (N.T. 9).  For the
reasons explained in Part V.B., _supra_, I will consider the Debtor's trial testimony, which I also
credit.

invoice stated unambiguously that it was an invoice issued by "Modern Classics." (<u>Id.</u>). In addition, both written communications the Debtor made to Jordan after the sale of the Eldorado that led to Jordan's agreement to accept the Speedster as a replacement car were on the letterhead of "Modern Classics, Inc." (Exs. G, H). Thus, there is little, if anything, in the multiple written communications between the parties that suggested that Jordan was dealing with the Debtor personally rather Modern Classics. I find this documentary evidence more compelling than the fact that the Debtor had Jordan make his checks payable to the Debtor instead of Modern Classics.

The clinching piece of evidence is the undisputed fact that once Jordan arose from his prolonged period of inaction and commenced litigation in 2012, he sued Modern Classics, not the Debtor. In doing so, he took the position, in court, that he had contracted with Modern Classics. At that time, he did not name the Debtor as a co-defendant. From this conduct, it is easily inferred that he understood his contract to have been with Modern Classics only. I do not go so far as to suggest Jordan is judicially estopped from asserting that he contracted with the Debtor. My point is only that his action speaks volumes. It suggests that, whatever the ambiguities there may be in the record regarding the identity of the party with whom he contracted, in 2012, he understood that party to be Modern Classics.

For these reasons, based on a preponderance of the evidence, I conclude that Jordan contracted only with Modern Classics and not with the Debtor. Therefore, his proof of claim must be disallowed to the extent that it is based on a breach of contract theory against the Debtor.

### D.  Unjust Enrichment

### 1.

Finally, Jordan asserts that his claim should be allowed based on the doctrine of unjust enrichment.

Unjust enrichment is an equitable doctrine in which the law imposes on a party an implied contract (or duty) to make payment for a benefit received, even in the absence of a contract.  See, e.g., Mitchell v. Moore, 729 A.2d 1200, 1203 (Pa. Super. Ct. 1999).

To prevail on an unjust enrichment claim in Pennsylvania, a plaintiff must establish:

> (1) a benefit conferred on the defendant by the plaintiff;
>
> (2) appreciation of such benefit by the defendant; and
>
> (3) acceptance and retention of such benefit under circumstances such that it would be inequitable for the defendant to retain the benefit without payment to the plaintiff

E.g., EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 273 (3d Cir. 2010); In re Lewis, 478 B.R. 645, 666 (Bankr. E.D. Pa. 2012); Telwell Inc. v. Grandbridge Real Estate Capital, LLC, 2016 WL 4035675, at *6 (Pa. Super. Ct. July 21, 2016).

Application of the doctrine is limited to particular circumstances:

> [T]he doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff.  Instead, a claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that ... would be unconscionable for her to retain.

EBC, Inc., 618 F.3d at 273; accord Lackner v. Glosser, 892 A.2d 21, 34 (Pa. Super. Ct. 2006).

## 2.

Here, there was no contract between Jordan and the Debtor.  See Part V.C., supra.  This brings the unjust enrichment doctrine into play.[15]

Jordan contends that the Debtor was unjustly enriched by his receipt of Jordan's $60,000.00 payment and that it would be inequitable for him to retain the benefit of that payment when he (and Modern Classics) provided nothing in return.  (Jordan's Br. at 18-19).

The flaw in this argument is that it fails to accord due consideration to the separate legal identities of Modern Classics and the Debtor.

Jordan entered into a contract with Modern Classics in which he promised to pay $60,000.00 and was promised a classic automobile in return.  Jordan performed his obligation, but Modern Classics breached the contract, went out of business and, eventually, had no assets to

---

[15] It is well established, as a general principle, that unjust enrichment cannot be applied when the relationship between the parties is based on a valid contract.  See, e.g., Wilson Area Sch. Dist. v. Skepton, 895 A.2d 1250, 1254 (Pa. 2006); In re Marcus Lee Associates, L.P., 422 B.R. 21, 36 (Bankr. E.D. Pa. 2009).  Typically, this principle is expressed in cases in which a plaintiff sues the defendant for breach of contract between the plaintiff and defendant, but asserts an alternative claim for unjust enrichment.  See generally Cosby v. American Media, Inc., 2016 WL 3901012, at *7 (E.D. Pa. July 15, 2016) (stating the principle, but noting that unjust enrichment may apply if the contract is wholly or partly unenforceable).  The facts here differ.  This is not a case in which there is a contract between the two (2) litigants and the claimant contends that unjust enrichment may supplement or replace his or her contract remedies.

I note that there is case law outside of Pennsylvania holding that the existence of an express contract between the plaintiff and a non-defendant third party precludes the plaintiff from maintaining an unjust enrichment claims against a defendant who was not a party to the breached contract.  See, e.g., Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC, 637 F. Supp. 2d 185, 196 (S.D.N.Y. 2009); Comprehensive Habilitation Servs., Inc. v. Commerce Funding Corp., 2009 WL 935665, at *13-14 (S.D.N.Y. Apr. 7, 2009); see also Snyder v. Freeman, 266 S.E.2d 593, 602–03 (N.C. 1980).  My research uncovered no reported Pennsylvania decisions discussing that specific issue.  In this case, I can and will resolve Jordan's unjust enrichment claim on other grounds, making it unnecessary for me to opine on this question of Pennsylvania law.

pay its creditors. Certainly, the Debtor received some benefit as a result of Jordan's payment. But, as stated above, not every benefit constitutes unjust enrichment.

The benefit the Debtor received from Jordan's payment to Modern Classics was the same benefit obtained by every principal of a closely held corporation each time a contractual payment is made to the corporation. By itself, that generalized benefit is insufficient to establish a claim for unjust enrichment. It is not unconscionable for a corporate principal to be free of liability for corporate debts based on the general benefits obtained by his or her status as officer, director or shareholder. That is the whole point of the corporate veil.

If Jordan's argument were accepted, the principal of a closely held corporation would be liable under the doctrine of unjust enrichment any time his or her corporation receives a contractual payment but is then unable to perform its obligations under the contract. To expand the doctrine of unjust enrichment in this fashion would subvert the fundamental protection shareholders, officers and directors obtain by incorporation. Stated another way, as a matter of law, the nonpayment of a corporate debt, by itself, is insufficient, to support a claim for unjust enrichment against a corporate principal. There must be something more.

**3.**

In fairness to Jordan, in this case, he can, and has, pointed to something else: at the Debtor's instruction Jordan made his payments to the Debtor personally and the Debtor deposited Jordan's check in his personal account. I find, however, that this "something" is not enough to support the unjust enrichment claim.

21

Certainly, Jordan's payment to the Debtor appears to be a corporate irregularity. It evinces a lack of respect for corporate formalities and a failure to maintain the legal distinction between the Debtor, personally, and his corporation. By pointing to this corporate irregularity, Jordan's unjust enrichment argument, to some extent, begins to merge or blur into a kind of "alter ego" argument. But, however the argument is conceptualized, the evidence is insufficient to establish that the Debtor was unjustly enriched in 1999 by Jordan's $60,0000.00 payment.

The Debtor's acceptance of a personal check must be considered in context. Modern Classics was in business for over twenty (20) years. Undoubtedly, it participated in numerous purchase transactions with suppliers and sales transactions with customers. The extent of this business activity and, more importantly, the frequency with which the Debtor used his personal account for Modern Classics' transactions was not developed at trial -- either for the 1999-2001 period in which most of the interaction between Jordan and the Debtor took place or over the extended period thereafter and prior to Modern Classics' bankruptcy filing.[16] Nor was the record developed on other relevant issues in either the 1999-2001 time frame (or a more extended time period) such as: how much, if any, of the $60,000.00 the Debtor invested back in Modern Classics; and whether the Debtor regularly treated Modern Classics revenues as personal income without paying corporate debts.

To illustrate the relevance of this missing information, consider the possibility that the Debtor's deposit of Modern Classics' revenue in his personal account was an isolated incident, and further, that the Debtor put most of Jordan's payment back into Modern Classics by paying corporate debts in 1999 or 2000. Based on those facts, it would be difficult to see any

---

[16] Given how much time passed before this dispute arrived in this court, it is not surprising that Jordan did not, or could not, develop a record on these subjects.

particularized benefit the Debtor received, much less an "undue" benefit warranting equitable relief.

The point here is that Jordan bore the burden of proof. Based on a single transaction in which the Debtor failed to respect corporate formalities by depositing the revenue of his closely held corporation in his personal bank account, I cannot conclude, without far more detail, that, more than seventeen (17) years later, the Debtor's retention of that payment would be so inequitable as to warrant the imposition of liability on the legal theory of unjust enrichment.

## VI.    CONCLUSION

For the reasons stated above, the Debtor's objection to Jordan's proof of claim will be sustained and the claim will be disallowed.  An appropriate order follows.

Date: **September 15, 2016**

**ERIC L. FRANK**

**CHIEF U.S. BANKRUPTCY JUDGE**